# CITY OF NORFOLK V. SOUTHERN RAILWAY COMPANY AND OTHERS.

January 12, 1915.

Absent, Keith, P.

1. DEDICATION—*Use for Public Purposes—Intention.*—Although property may have been used for public purposes, it will not be held to have been dedicated to such purposes, where it does not appear that, in so using it or permitting it to be used, the owner had dedicated it to the public and lost dominion over it for other purposes.

2. DEDICATION—*Intention—How Evidenced—Case at Bar.*—While the intent to dedicate may be inferred from facts and circumstances connected with a long and uninterrupted user by the public, the acts and declarations of the owner indicating an · intention to dedicate must be unmistakable in their purpose and decisive in their character to have that effect. The facts and circumstances of the case at bar are sufficient to rebut any intention, to dedicate on the part of the owner.

3. CONTRACTS—*Lease—Consideration.*—The agreement on the part of a large railroad company to make a city its deepwater terminus, with its passenger station located on property leased of the city, furnishes a valuable consideration for the lease.

4. APPEAL AND ERROR—*Rulings on Evidence—When Not Reviewed.*—The rulings of the trial court on the admission and rejection of evidence will not be reviewed by this court where it appears that, if it had admitted what was rejected, and had rejected what was admitted, it could not properly have rendered a different judgment from that which was rendered.

Error to a judgment of the Circuit Court of the city of Norfolk in an action of ejectment. Judgment for defendants. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Geo. C. Cabell, S. S. Field, Geo. A. Frick, G. A. Williams* and *Geo. Pilcher,* for the plaintiff in error.

*Williams, Tunstall & Thom, W. B. McIlwaine* and *D. Tucker Brooke,* for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

This is an action of ejectment brought by the city of Nor-folk, the plaintiff in error, to recover certain lands now in the possession of the Southern Railway Company and the Atlantic Coast Line Railroad Company, the defendants in error. Neither party requiring a jury, the cause was heard by the court and a judgment rendered in favor of the de-fendants. To that judgment this writ of error was awarded.

Upon the merits, the question involved is the defendant's right of possession, and incidentally that of a number of other persons, individual and corporate, to certain real es-tate situated in what is commonly known as the "Town Point" area, in the city of Norfolk.

In the year 1895, the city of Norfolk leased the greater part of the land sought to be recovered in this case, consist-ing of several parcels, to the Southern Railway Company for a period of thirty years, with the right on the part of that company to continuous renewals of thirty year periods upon certain conditions. The Southern Railway Company sublet a portion of the said property to its co-defendant, the Atlantic Coast Line Railroad Company. The other portion of the land sued for the defendants claim by virtue of as-signments from third persons which the plaintiff city had leased to Richard Evers Lee by deed dated in June, 1797. The defendants were each in the possession of the lands so

held by them, respectively, at the time of the institution of this action.

The plaintiff city bases its right of recovery upon the ground that the leases made by it were null and void because *ultra vires,* and because the latter lease was without consideration. It claims that the leases were *ultra vires* because the property leased was held by it "in trust for the public," and it therefore had no power to lease it for railroad or other purposes. The city insists that it appears that the land in dispute "was held in trust for the public," from the manner in which it was originally acquired, by platting and designating on the plat the land in controversy as "public landing," and also as "Reserved for Public Uses," and by its being referred to in the said lease to Lee as "a public landing" and "public lands," and by its treatment by the "Borough of Norfolk," the "Town Point Company and the city of Norfolk."

Pursuant to an act of the Colonial General Assembly, passed in the year 1680 (2 Hening's St. at Large, 471), Nicholas Wise, in August, 1682, conveyed in trust fifty acres of land lying on Elizabeth river to William Robinson and Anthony Lawson for the purposes of laying out a town and selling lots of one-half acre each to any person who would build a storehouse or dwelling thereon. It appears that all of the tract was sold by the trustees except that portion located south of Main and west of Jackson streets, known at that time as "Fort Land," and now as the "Town Point" land; and that upon a portion of the "Town Point" land was located a public warehouse used largely for the storage of tobacco; that the public warehouse was discontinued by an act of the General Assembly in the year 1752 (6 Hening St. at Large, 351); that in the year 1761 (7 Hen. St. at Large, 433), the General Assembly passed an act authorizing a conveyance of the said unsold land to certain trustees in consideration of two thousand pounds to be expended in

preserving and improving the property upon which a public warehouse lately stood, commonly called the "Fort Land" which was "wasting away by the washing of the river;" that pursuant to that act the property was conveyed to the said trustees, subject, however, to be defeated by the repayment of the two thousand pounds for which the property had been sold to the said grantees, at any time by the justices of the county of Norfolk or the authorities of the borough of Norfolk in the event the county officials refused to repay the said sum of two thousand pounds; that the trustees refused to accept the property unless the county of Norfolk was divested of all interest therein; that to remedy this objection an act was passed the following year (7 Hen. St. at L. 511), giving the right to purchase the land or to repay the said two thousand pounds exclusively by the Borough of Norfolk; that the said trustees afterwards had themselves incorporated as the Town Point Company, took possession of the property, improved it, received the rents and profits therefrom, and otherwise used it as feoffees until the year 1791 when the borough of Norfolk entered into negotiations with the Town Point Company looking to the acquisition of its said lands; that these negotiations resulted in a contract by which the Town Point Company agreed to relinquish all its interest in its said lands to the borough of Norfolk upon certain terms; that this agreement was specifically executed in the year 1792 by the Town Point Company executing a quit claim deed to the borough of Norfolk.

The effect of this conveyance and the act of the General Assembly authorizing the borough of Norfolk to acquire said property was to clothe it with a fee simple title to the said property. The plaintiff insists that prior to the year 1761 this property had been dedicated by the borough or county of Norfolk for public purposes, and that, in pursuance thereof, a public warehouse and public wharf had been

established thereon, and that when the borough acquired the whole title to the property in the year 1792, it was impressed with the same trusts and could not therefore be otherwise used by the borough or city of Norfolk.

While said property or portions of it may have been used for such public purposes, it does not appear that in so using it or in permitting it to be used the county or borough had dedicated it to the public and lost dominion over it for other purposes. *City of Boston* v. *Le Craw,* 17 How. (U. S.) 426, 435, 15 L. Ed. 118.

The Town Point Company, when it became the owner or controller of the property did not understand that the property could be used only for public purposes. Their whole dealings with it show the contrary. The act of Assembly authorizing the conveyance of the property to that company gave the right to improve the property as in their judgment might seem wise, erecting warehouses or storehouses thereon, collecting rents therefrom and distributing the profits among its stockholders. When that company conveyed and relinquished its rights in the property to the borough of Norfolk, the latter did not understand that it was acquiring property which had been dedicated for public purposes other than to the extent declared in the original conveyance from Wise in the year 1680. This is shown by the report of a committee appointed by the borough before purchasing from the Town Point Company and by the manner in which the borough immediately after its agreement to purchase dealt with the property, and it and the city of Norfolk has ever since dealt with it. It is stated in that report:

"The committee to whom the report of the committee appointed to wait on the trustees of the Town Point Company was referred, made their report in these words, to-wit: 'The committee to whom was referred the report of the committee appointed to know on what terms the trustees of

the Town Point Company would relinquish their right to the Town Point land to the corporation report: It appears to your committee that it would be of considerable advantage to the corporation if the Town Point land was properly improved; that in its present state it is injurious to the harbour, and must without attention lessen the draught of water in the channel; that a thorough repair of the property would be a means of inviting an additional number of merchants to reside among us, and must eventually facilitate the commerce of the town, the dispatch which shipping would receive from the local situation of the place; that the land in its prime state appears to have been improved by the trustees at an expense very near equal to the sum originally subscribed by the proprietors—that notwithstanding this expense already incurred by the company, it would be hazardous in them to advance an additional sum, equal to the necessary repairs of the property, so long as the corporation hold the right of claiming the same on the payment of the sum originally subscribed—that in the present state of the property, it cannot be of advantage to the proprietors, or the corporation, but must, if suffered to continue so, be injurious to both—that from the best information, and from the calculation of men well acquainted with the property, it would yield, if properly managed, an annual revenue of £400—that the trustees offer to relinquish their right to the corporation on their being secured the payment of the original sum subscribed by the proprietors, with interest to accrue on the same from the first of October next, one-third of the principal to be paid on the 1st of October 95, one-third on the 1st of October 96, and the other one-third the 1st of October 1797. It further appears to your committee that from the state of the property it is essential that the proprietors and trustees or the body corporate should take some decided step for the removal of the obstacles that at present obstruct the repairs—that no other

mode appears adequate to that desirable end, but, the pur-
chase of the right by the corporation from the trustees, or
the relinquishment of the right of the corporation to the
trustees.  It appears to your committee that the former of
these would tend greatly to the advantage and benefit of the
corporation—inasmuch as the interest of£2000 to be paid
by the corporation to the trustees would leave a clear profit
of £300 a year to the corporation, calculating the annual in-
come of the property at £400, which £300 appropriated an-
nually to the extinguishment of the principal would in two
years enable the corporation to make the first payment—
the corporation by acting in this manner will be more than
equal to the demand of the second payment at the time it
shall become due, and with respect to the last payment with-
out regard to fractions, the corporate body will have entire
possession of the property for a less sum than £500.  Your
committee further observe that the property will by that
period be in such a state of improvement, that the corpora-
tion might with very little trouble raise a sum from the
property itself more than adequate to any demand which
may arise from the purchase."

Immediately after the borough of Norfolk had acquired
the property from the Town Point Company it appointed a
committee "to advertise and let out on lease the Town
Point land."  The commissioners so appointed fixed the
terms upon which the said property would be leased, and
their action was afterwards approved and ratified by the
borough of Norfolk.  Among these terms was the provision
that the property was to be leased in lots according to a
plat, upon a ground rent to be paid annually for the term of
ninety-nine years each, renewable forever if the other con-
ditions of the terms expressed in the lease were complied
with.  The said letting was advertised in cities in and out
of this State and some thirty leases so made were reported
to and approved by the borough of Norfolk.  Among these

was the letting to Richard Evers Lee of a part of the land in controversy. From time to time other letting of said property was made by the borough or city of Norfolk down to and including that to the defendant Southern Railway Company in the year 1895.

It is a conceded fact in the case that the property known as the Town Point land, "bounded on the north by Main street, on the east by Fayette street, and on the south and west by Elizabeth river are held. and claimed under lease from the city of Norfolk by about fifteen different individuals and corporations, and that the lands and buildings thereon are worth approximately $2,000,000."

The plaintiff introduced in evidence over the objection of the defendants an old plat or map purporting to have been drawn before the year 1800—precisely when does not appear from the printed record—upon which a part of the Town Point land is designated as "reserved for tobacco warehouse and other public purposes" without explanation or evidence of the borough's or city's intent. There is also evidence of use by the city of the property, first as a tobacco warehouse, and afterwards when the demand for a warehouse no longer existed, for a general storage warehouse leased by the city to private persons, which old warehouse was afterwards removed by, or with the approval of, the city and the property sold or leased to persons, individual and corporate, who have used the same in the advancement of commerce by the development of railway terminals, the improvement of the facilities for the transportation of persons and property, and otherwise. But the evidence does not show an express dedication of the property for the use and benefit of the public.

While the intent to dedicate may be inferred from facts and circumstances connected with a long and uninterrupted user by the public, the acts and declarations of the owner indicating an intention to dedicate must be unmistakable in

their purpose and decisive in their character to have that effect. *Harris* v. *Com'th*, 20 Gratt. (61 Va.) 833.

In this case, while there is some evidence tending to show a dedication, it is difficult to imagine, as was said by the trial court, how acts and conduct of the borough or city of Norfolk could have gone further in disproving an intention to dedicate than the record in the case discloses. The use of the property for more than one hundred years for purposes other than those for which it is claimed, it was dedicated or for other "public uses" within the meaning of that term, without question by the city or any of its inhabitants, so far as the record shows, during that long period would seem sufficient to rebut any intention to dedicate on the part of the borough or city.

The plaintiff having failed to show that the property sued for was held by it in trust for the use and benefit of the public, its action in leasing the same was not *ultra vires.*

The remaining question upon the merits is, was the lease to the Southern Railway Company void for want of consideration?

In consideration of the lease, the Southern Railway Company undertook and bound itself to do several things. Conceding that some of these things it was bound to do as a public service corporation, independent of contract, it was not bound, as it agreed to do and did, to make the Norfolk harbor its deepwater terminus with its passenger station located on the Town Point property. It cannot be seriously insisted, certainly the court cannot hold, that the benefits arising to the city from bringing that railway system, one of the largest, if not the largest, in the southern section of the country, to its harbor were not sufficient consideration for the lease by the city.

Of the twenty-two bills of exceptions filed in the cause all but two relate to the action of the court in admitting and rejecting evidence. It does not seem from the petition for the

writ of error, or from the reply brief, that very much reliance is placed upon the assignments of error based upon the action of the court in admitting and rejecting evidence. Be this as it may, it will be sufficient to say that some of the evidence admitted over the plaintiff's objection was clearly admissible; that some which it offered was properly rejected because it was not, or was not shown to be, relevant; and that as to the other about which there might be some question as to the correctness of the court's action, no prejudice resulted to the plaintiff; for if the court had admitted what it rejected and rejected what it admitted of the last-mentioned evidence, it could not properly have rendered a different judgment from that which was rendered.

Upon the whole case the court is of opinion that there is no error in the judgment complained of, but that it is plainly right and should be affirmed.

*Affirmed.*